IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DEVONNA CULPEPPER                                                     PLAINTIFF

V.                                    NO. 4:06cv00180 JWC

DEPARTMENT OF AGRICULTURE                                    DEFENDANT

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A three-day bench trial in this case concluded on June 9, 2010. The Court's[1]

findings of fact and conclusions of law are as follows:

# I.
## Introduction

Plaintiff is an employee of the United States Department of Agriculture (USDA or

Defendant), Rural Development agency (RD). She is hearing impaired[2] and this action

is governed by the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*[3] She claims denial

of promotion opportunities, disparate treatment and failures to make reasonable

accommodations for her disability, alleging the theories of discrimination and of retaliation

for earlier protected activity.

---

[1]The parties have consented to the Magistrate Judge's jurisdiction (doc. 54).

[2]Interpreters were provided for Plaintiff throughout the trial.

[3]The Rehabilitation Act is the exclusive remedy for federal employees claiming disability discrimination. *Lewis v. Johanns*, 180 Fed. Appx. 599, 601 (8th Cir. 2006) (also noting that cases interpreting the Rehabilitation Act and the Americans with Disabilities Act of 1990 are interchangeable); *see* 29 U.S.C. §§ 791(b) (federal hiring, placement and advancement of individuals with disabilities), 794(a) (nondiscrimination under federal grants and programs), 794d (accessibility of electronic and information technology). The Rehabilitation Act also prohibits retaliation against employees who initiate or participate in a proceeding or investigation that claims their employer violated anti-discrimination law. 29 U.S.C. § 794(d) (incorporating ADA's anti-retaliation provisions).

## II.
## General Background

Plaintiff was graduated from the Arkansas School for the Deaf in 1978 and went to work for USDA in 1979.  The parties stipulate that she is disabled for purposes of the Rehabilitation Act.  There was some conflict in the proof as to the actual extent of her hearing loss.  Plaintiff stated that she is able to speak, and I find that she is able to carry on a face-to-face conversation with another so long as the other person speaks slowly and distinctly.  To do this, Plaintiff must rely primarily on lip reading.[4]  She wears hearing aids, without which she can only feel vibrations.  Plaintiff is unable to follow multiple conversations in a group setting and would not be able to hear and understand broadcast video (such as in a "webinar") without open or closed captioning.  She has been provided a telecommunications device for the deaf (TDD), which allows her to communicate by phone.  Plaintiff would be unable to take notes at a meeting due to the impossibility of reading lips and writing notes simultaneously.

Plaintiff is currently a loan technician in the Single Family Housing (SFH) section of RD's State Office, and her grade level is GS-7, step 10.  She has been a GS-7 approximately twelve years.  Persons with less seniority and whom she has trained have been promoted beyond her level.  Since 1990, she has not received a promotion except as the result of equal employment opportunity (EEO) complaints or litigation (through settlement).

---

[4]Defendant referred to a letter Plaintiff had written an EEO counselor in November 1995, in which she stated that with her hearing aids, she could hear approximately 50 percent of what a normal person hears.  I do not give the letter weight.  It was written fifteen years ago, and I believe Plaintiff's assertion that her hearing has deteriorated further.

Plaintiff has performed her work satisfactorily throughout her career. All co-workers, supervisors and other superiors, including her current immediate supervisor, Cheryl Ivy, agreed in testimony that she is a competent and good employee.

Prior to 2005, Plaintiff filed two other EEO complaints against the USDA, both of which were eventually settled: CR 960209 (which was settled without litigation), and *Culpepper v. Veneman*, E.D. Ark. No. 4:02-cv-00588-WRW (which was settled by agreement of the parties in April 2004). (Pl.'s Ex. 6 & 11; Def.'s Ex. 1.)

On January 17, 2005, Plaintiff sent a letter to the Director, Office of Civil Rights (OCR), USDA, in Washington, D.C., requesting to file an EEO complaint alleging discrimination and retaliation based on events occurring through that date, including her non-selection for a purchasing agent position announced in November 2004. (Pl.'s Ex. 33A.) On May 22, 2006, Plaintiff sent a second letter to the OCR Director, requesting to file a complaint alleging discrimination and retaliation regarding a loan specialist vacancy announcement in April 2006. (Pl.'s Ex. 33.) The OCR has never issued a Final Agency Decision (FAD) on her administrative complaints.[5]

Plaintiff filed the current action in this Court on February 6, 2006 (doc. 1), and filed an amended complaint on March 2, 2007 (doc. 4). At trial, she presented general evidence of her employment history, including the fact that her promotions have lagged far behind those of her contemporaries. She was allowed to introduce evidence of her relations with other employees and supervisors as well as evidence of specific alleged disparate

---

[5]It is disturbing that the OCR Director never acted on the complaints, first taking the position that it had no record of the complaints and then, when confronted with proof of delivery, saying that they had been lost. (Pl.'s Ex. 33, 33A, 39-42.) However, that office's failure to investigate and act on the complaints does not afford an independent basis for relief.

treatment and failures to accommodate, some of which have occurred after the amended complaint was filed.   Much background evidence was admitted as probative on discriminatory or retaliatory intent only.  It would appear that the USDA, generally speaking, has failed to live up to the spirit and intent of the Rehabilitation Act.  It would behoove USDA and Arkansas RD to reexamine their practices and procedures.  There is no excuse for "losing" discrimination complaints submitted by employees.   They should be investigated thoroughly and promptly.  The agency also should make every effort to ensure that disability awareness among its employees is raised through regular observances of an awareness month and through regular training.

Even though it appears Plaintiff has been treated unfairly at times through her years of employment, I can, of course, consider only those specific claims properly pleaded and before the Court.


### III.
### Exhaustion

Before the federal courts may hear a discrimination claim, an employee must fully exhaust her administrative remedies. *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003).  For a federal employee, this requires, as an initial matter, that she contact an EEO counselor within forty-five days of the date of the matter alleged to be discriminatory or of the effective date of the alleged discriminatory personnel action. *Id.* (citing 29 C.F.R. § 1614.105(a)(1)); *Jensen v. Henderson*, 315 F.3d 854, 858 (8th Cir. 2002).

Previously in this action, the Eighth Circuit Court of Appeals found that Plaintiff's January 2005 and May 2006 letters to the OCR Director satisfied § 1614.105(a) because

they (1) initiated contact with an agency official who is logically connected with the EEO process and (2) demonstrated her intent to begin the EEO process. *Culpepper v. Schafer*, 548 F.3d 1119, 1123-24 (8th Cir. 2008) (doc. 24). However, the Court expressly declined to decide whether Plaintiff's letters were submitted within the forty-five-day limitations period. *Id.* at 1124 n.4. I find those letters to have been timely.

Defendant has argued consistently that some of Plaintiff's claims were not administratively exhausted because they are based on events that occurred more than forty-five days before her January 2005 and May 2006 letters, or on events that occurred several years *after* the letters. Plaintiff contends that, because Defendant has failed to investigate or even acknowledge her previous administrative complaints, she is not required to exhaust her administrative remedies with respect to every claim of wrongful conduct by Defendant. Plaintiff further argues that the recent claims are sufficiently related to the earlier claims that they should be allowed to proceed without further administrative exhaustion. The Eighth Circuit has held that, where alleged discriminatory or retaliatory conduct has occurred subsequent to a timely filed EEOC charge, a plaintiff may be deemed to have exhausted administrative remedies "if the allegations of the judicial complaint are like or reasonably related to the administrative charges that were timely brought." *Wedow v. City of Kansas City*, 442 F.3d 661, 672-74 (8th Cir. 2006) (quoting *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir.1986)).

Despite concerns that Plaintiff has not administratively exhausted many of her claims and that she has not demonstrated that the non-exhaustion should be excused,[6] I

---

[6]While futility can be an exception to the administrative exhaustion requirement in employment discrimination cases, the exception is narrowly tailored and the plaintiff bears a heavy

have proceeded to the merits of her arguments because her claims were fully litigated and, as explained below, do not entitle her to relief for other reasons.

## IV.
## General Law

In disparate treatment and retaliation cases, the key element is intent. *Peebles v. Potter*, 354 F.3d 761, 766, 770 (8th Cir. 2004). In the absence of direct evidence on the issue, Plaintiff's disparate treatment and retaliation claims are analyzed under the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Mershon v. St. Louis University*, 442 F.3d 1069, 1074 (8th Cir. 2006); *Peebles*, 354 F.3d at 766; *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000); *Norcross v. Sneed*, 755 F.2d 113, 116-17 (8th Cir. 1985). Her claims of failure to accommodate are analyzed under a "modified burden-shifting analysis" because discriminatory intent is not at issue. *Mershon*, 442 F.3d at 1074; *Peebles*, 354 F.3d at 766.

To establish a prima facie case of disparate treatment on the basis of disability, Plaintiff must show that: (1) she was disabled within the meaning of the Rehabilitation Act; (2) she was qualified with or without reasonable accommodation to do the essential functions of the position in question; and (3) she suffered an adverse employment action solely because of her disability. *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008); *Peebles*, 354 F.3d at 765. The first two elements are not at issue in this lawsuit.

---

burden of establishing its applicability. *Rann v. Chao*, 154 F. Supp. 2d 61, 65-66 (D.D.C. 2001). Moreover, the Eighth Circuit adheres to a "narrow reading" of the "like or reasonably related" exception to exhaustion. *Wedow*, 442 F.3d at 673-74.

Under the *McDonnell Douglas* framework, if Plaintiff makes the prima facie showing for a disparate treatment claim, the burden shifts to the employer to rebut the presumption of discrimination by articulating legitimate, nondiscriminatory reasons for the adverse employment action. *Norcross*, 755 F.2d at 116-17. If that requirement is satisfied, the burden shifts back to Plaintiff to show that the reasons offered are pretextual and that the employment decision was based solely on her disability. *Id.* Plaintiff retains the ultimate burden of persuasion on the case as a whole to prove that she was subjected to the adverse employment action solely because of her disability. *Id.*

Failure to accommodate is a separate form of prohibited discrimination under the Rehabilitation Act. *Buboltz*, 523 F.3d at 870. Such discrimination occurs if "a covered entity [does] not ... make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 29 C.F.R. § 1630.9(a); *accord Peebles*, 354 F.3d at 766; *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002). If an employee requests an accommodation, the employer must engage in an interactive process to determine whether reasonable accommodations are possible. *Buboltz*, 523 F.3d at 870. If such accommodations are possible, the employer must reasonably accommodate the employee's request, but not necessarily the exact accommodation requested. *Id.*

To establish a prima facie case of retaliation, Plaintiff must demonstrate: (1) that she engaged in a statutorily protected activity, (2) that a materially adverse action was taken against her, and (3) that a causal connection exists between the adverse action and the protected activity. *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007); *Robinson v.*

*Potter*, 453 F.3d 990, 994 (8th Cir. 2006); *Mershon*, 442 F.3d at 1074.  If this showing is made, the burden then shifts to the employer to proffer a legitimate nondiscriminatory reason for the adverse action.  *Mershon,* 442 F.3d at 1074.  The burden of production then shifts back to Plaintiff to show that the employer's reason is a pretext for retaliation.  *Id.*

## V.
### November 2004 Failure to Promote Based on
### Merit Promotion Vacancy Announcement AR-05-01
### (Purchasing Agent) GS-1105-7/9

RD issued this Merit Promotion Vacancy Announcement for a purchasing agent position on November 2, 2004.  (Def.'s Ex. 3.)  Plaintiff applied for the position.  (Pl.'s Ex. 59; Def.'s Ex. 11.)  She was notified that she was not selected on December 2, 2004.  (Def.'s Ex. 19, at 4.)  She claims that she failed to make the best-qualified list to be referred to the selecting official due to discrimination and retaliation.  I find this claim was administratively exhausted through her January 17, 2005 letter to the OCR Director.

A.     Evidence.

At the time of the vacancy announcement, Plaintiff was working in the Single Family Housing section of the RD State Office in Little Rock, under the supervision of Lawrence McCullough.  The purchasing agent position was in a different section of the State Office, and Sharon Shireman was the supervisor for the position.

The vacancy announcement directed applicants to submit a narrative statement addressing five evaluation criteria, known as KSAs (Knowledge, Skills and Abilities).  They were:

A.      Knowledge of purchasing regulations, policies, procedures and common business practices in order [to] process requests and manage agency property and related records.

B.      Knowledge of personal property management in order to identify, control, inventory, maintain, replace and dispose of property.

C.      Skill in using computer programs, such as automated procurement systems, property management, work processing, databases, and spreadsheets in order to perform purchasing and property management functions.

D.      Ability to organize and prioritize work in order to ensure that purchases are made in a timely manner, pending orders can be tracked, and information for the preparation of procurement reports can be compiled.

E.      Ability to communicate orally and in writing in order to exchange information with internal and external customers.

(Def.'s Ex. 3.)  According to the testimony, KSAs are created through consultation between RD's human resources (HR) department and the supervisor for the open position.  The purchasing agent position was announced at both the GS-7 and GS-9 pay levels.  Applicants could apply at either or both levels.

Before submitting her application, Plaintiff sent an e-mail to Sherry Boerner Johnson,[7] the HR manager.  Plaintiff sought clarification as to the expectations for the oral communication criteria in KSA E, asking whether such tasks could be accomplished through use of a TDD or interpreters.  Ms. Johnson promptly responded to the e-mail, assuring her that was possible and answering Plaintiff's other questions.  (Def.'s Ex. 5.)

Plaintiff applied only at the GS-9 level, explaining that she was already at GS-7 and was seeking a promotion.  Her application packet included, among other things, a narrative addressing each KSA, as well as a Supplemental Supervisory Skills Assessment (SSSA)

---

[7]Some references in the record are to Sherry Boerner and some to Sherry Johnson, she will be referred to here as Ms. Johnson.

form, signed by her immediate supervisor, Mr. McCullough.  Mr. McCullough rated her exceptional (the highest possible rating) in four out of the five KSA categories, and above average in the fifth.  (Pl.'s Ex. 59, at 18; Def.'s Ex. 11, at 18.)

Three RD employees were designated by the State Director at the time (John Allen) to serve on the Merit Promotion Panel for the purchasing agent vacancy: Shirley Tucker, Jerry Virden, and Cheryl Ivy.[8]  (Def.'s Ex. 6.)  There was no allegation or evidence of discriminatory or retaliatory conduct by Mr. Allen.  None of the panel members asked to serve on the panel.  All of them knew Plaintiff, but none had ever supervised her or ever worked with her in the same program area.

The panel met on November 30, 2004.  Ms. Ivy was the chairperson.  No testimony explained how she was selected as chairperson.  Also present was Ms. Johnson, the HR manager, serving as the "expediter" or facilitator for the panel.  The three panelists signed a document stating that Ms. Johnson had explained and discussed the applicable procedures prior to the evaluation process.  (Pl.'s Ex. 19; Def.'s Ex. 7.)  Among other things, the document advised that "no non-merit factors such as age, sex, etc., are to be considered or discussed during the panel process."  All three panel members testified that they complied with this requirement, and that neither Plaintiff's hearing impairment nor prior EEO activity was a factor in their evaluations.  Ms. Ivy and Ms. Tucker said they were not aware of any prior EEO activity, and Mr. Virden said he "did not recall."  The document also advised the panel members that they were to "consider all relevant factors (awards, training, performance ratings, experience, and education) as contained in the application

---

[8]Mr. Virden and Ms. Tucker are now retired.

as submitted." The panel members all testified that they complied with this provision and reviewed the complete application packets for each applicant.

Ms. Johnson provided a "rating guide" for the panel members to use in their evaluations. (Pl.'s Ex. 21; Def.'s Ex. 8.) The guide listed the five KSAs from the vacancy announcement. The guide further included a "KSA Definition and Rating Scale," identifying specific skills or experience under each KSA that were necessary in order to receive "points." The applicant could receive five points (superior level), three points (satisfactory level), or one point (minimally acceptable level). The requirements were more rigorous for the GS-9 level than they were for the GS-7 level.

Plaintiff and five others applied and were qualified for the position at the GS-9 level. (Def.'s Ex. 11-15.) Each panel member independently prepared score sheets, individually rating the applicants pursuant to the rating guide. (Pl.'s Ex. 20; Def.'s Ex. 9.) The panel members then discussed how they arrived at their scores. Ms. Ivy testified that, during the discussion, each panelist could revise his or her rating based on the comments, or not revise it. The forms show that all panel members made some changes to their score sheets at some point. Ms. Johnson totaled the final score sheets. Plaintiff received zero points under KSA A, three points under KSA B, three points under KSA C, zero points under KSA D, and fifteen points under KSA E. The point totals for all candidates at the GS-9 level were as follows:

|  | Total Points Awarded | Average Score |
|---|---|---|
| Plaintiff | 21 | 7 |
| Brenda Holloway | 36 | 12 |
| Alice Horton | 30 | 10 |
| Alta Mullinax | 30 | 10 |
| Melinda Sharp | 33 | 11 |

(Pl.'s Ex. 20, at 1; Def.'s Ex. 9, at 1.)  The "break point" was determined to be 10, meaning that the names of all applicants at the GS-9 level except Plaintiff were submitted for consideration on the best-qualified list.[9]  From that list, the State Director (Mr. Allen) selected Ms. Sharp for the position at the GS-9 level.  (Def.'s Ex. 10.)

   B.   Prima Facie Claim.

To establish a prima facie claim of discrimination on a failure-to-promote claim, a plaintiff must show that she qualified and applied for an available position, she was rejected, and a similarly situated employee who is not a member of the plaintiff's protected group was promoted instead.  *Moore v. Forrest City School Dist.*, 524 F.3d 879, 883 (8th Cir. 2008); *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 937 (8th Cir. 2007); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir. 2002).  Plaintiff has met these requirements.  She has shown that she qualified and applied for the purchasing agent position, and was rejected.  None of the applicants who made the best-qualified list, including the selectee, was in her protected group.

It is not as clear that she has established a prima facie claim of retaliation.  She engaged in protected activity, and failure to make the best-qualified list was a materially adverse action in that it precluded her from consideration for a promotion.  However, the third element is causation, which requires Plaintiff to show that retaliation was a "determining factor" in the adverse action at issue.  *Van Horn v. Best Buy Stores*, 526 F.3d 1144, 1148 (8th Cir. 2008); *Carrington v. City of Des Moines*, 481 F.3d 1046, 1053 (8th Cir. 2007).  As explained below, Plaintiff has not presented sufficient evidence that retaliation

---

[9]Two applicants who applied at the GS-7 level (Ms. Horton and Ms. Sharp) also made the best-qualified list.

was a determining factor in the panel's decision.  Even if she could make a prima facie case of retaliation, the evidence as a whole shows that the panel's decision was supported by legitimate, non-retaliatory reasons.

Therefore, the real issue for determination is whether Defendant's reasons for Plaintiff's non-selection were legitimate and nondiscriminatory, or whether they were instead pretexts for disability discrimination or retaliation.

C.    Analysis.

Plaintiff pointed to certain evidence to support her pretext argument.

First, she said the agency failed to notify her that she could have applied as a noncompetitive referral.  To the contrary, the purchasing agent vacancy announcement clearly included information on how to apply under "special hiring authorities," which were available for "individuals with disabilities," veterans and others.  The application directed eligible applicants to submit two applications if they wished to be considered under an appropriate special hiring authority as well as the competitive examining process.  (Def.'s Ex. 3, at 3.)  Additionally, the testimony was that Plaintiff was initially hired noncompetitively under the special hiring authority and thus would have been aware of its availability.[10]  This argument does not support a finding of pretext.

Next, Plaintiff argues that she should not have received zeros on KSA A and KSA D because her application package contained evidence of experience meeting the evaluation criteria for those categories.  In support, she pointed to her narratives regarding

---

[10]Sandra O'Brien, the current HR manager, testified that applying under a special hiring authority was not advantageous for existing employees because it requires a two-year probationary period.

her current and past job duties, her list of training and awards, and the exceptional ratings from Mr. McCullough on the SSSA form.

The panel members all testified that Plaintiff's scores of zero were warranted because her documentation did not support the specific criteria of the relevant KSAs as set forth in the rating guide. Ms. Tucker explained it best, stating that, to warrant a score of one at the "minimally acceptable level" on a particular KSA, an applicant had to meet all the criteria listed in the rating guide for that KSA. For example, one of the criteria under KSA D was "actively involved in providing training." Ms. Tucker said that, because there was no evidence that Plaintiff met this criterion, she could not receive a score of one. The panel members' testimony was consistent in this regard, and each adequately explained his or her scores.

There were extensive questioning, testimony and argument regarding the SSSA form. Plaintiff contended that Mr. McCullough's SSSA form constituted relevant evidence that the panel should have taken into account in awarding points because he rated her highly in each of the five KSAs at issue. All panel members testified that they "considered" the form, but gave it little or no weight in awarding points. The evidence from the panel members and other witnesses showed that it was an optional form not used by all federal agencies, that it was clearly designated as optional on the application form, that not all applicants included it, that it was subjective and rarely contained negative information, and that the supervisor did not have the rating guide for the particular position before him or her when completing the form. Mr. McCullough testified that, whenever one of his employees asked him to complete the form, he did. As stated, the rating guide identified specific skills for the panel members to evaluate under each KSA. The SSSA form listed only the five

14

broad KSA categories set forth in the vacancy announcement.  Mr. McCullough testified that he had "no idea" what factors a merit promotion panel was supposed to consider when deciding who to promote or who should make the best-qualified list, and he said he did not know why someone would receive a zero in a particular KSA category.  This underscores the testimony of panel member Ms. Tucker that those who fill out the SSSA form do not know the particular KSA factors set forth in the rating guide that the panel will be using to award points.

Two other applicants who included a SSSA form in their applications also received zeroes in a category.  (Def.'s Ex. 9, Def.'s Ex. 13, p.19; Def.'s Ex. 17, p. 8.)  This negates any inference that the panelists singled Plaintiff out by giving her a zero despite the presence of a SSSA form in her application packet.  Furthermore, even if all panelists had given Plaintiff a score of one in KSA A and in KSA D due to the SSSA form, this would have raised her total by only six points, still not enough to make the best-qualified list at the GS-9 level.

Plaintiff asserts that all panel members gave her the same scores in every category. This is true, but the panel members ended up giving the same scores to *every* GS-9 applicant.  As stated, the panel members testified that, after they prepared their individual ratings, they discussed how they arrived at their scores.  Ms. Ivy testified that, during the discussion, each panelist could revise his or her rating based on the comments, or not revise it.  Ms. Tucker testified that they would have gone through and discussed what they were looking for as far as qualifications and to make sure they "understood and agreed on what we were looking for."  The forms show that all panelists made some changes to their score sheets at some point.  Ms. Ivy made what appear to be five changes on her score

sheet, including changing Plaintiff's score on KSA B to a one, but the original score is not readable.  Mr. Virden made several changes, including changing Plaintiff's score on KSA B from a three to a one and what "looks like" changing her score on KSA D from a one to a zero.  Ms. Tucker appears to have made three changes on her score sheet, including *increasing* Plaintiff's score on KSA B from zero to one.  (*See* Pl.'s Ex. 20; Def.'s Ex. 9.) The panelists' testimony was consistent in this regard, and I find that the uniform scores do not necessarily demonstrate discriminatory or retaliatory intent.[11]

Plaintiff also argued that pretext has been demonstrated by sloppiness on the part of the panel members, including: (1) the failure of Ms. Ivy and Ms. Tucker to sign their individual ranking sheets; (2) the failure of Ms. Tucker to rate two applicants at the GS-7 level; and (3) the failure of Ms. Tucker and Mr. Virden to provide written comments regarding any applicants other than Plaintiff.  The panel members adequately explained these oversights and discrepancies in their testimony, and I found them credible on those points.  In any event, the issue is not whether the panel members accurately filled out their evaluation forms, but whether the inaccuracies demonstrate discriminatory or retaliatory intent.  I find that they do not.  A poorly implemented selection process is not actionable in itself.  There must be discrimination or retaliation.

Plaintiff seeks to infer discriminatory or retaliatory intent through the involvement of Ms. Johnson and Ms. Ivy in the merit selection process.  Her theory apparently was that

---

[11]Even if the original unrevised scores were tallied, Plaintiff still would have had the lowest number of points at the GS-9 level and would not have had enough points to make the best-qualified list.

they improperly influenced the panel and made sure Plaintiff did not make the best-qualified list, thereby preventing her from being considered for promotion.

Counsel characterized Ms. Johnson as one of Plaintiff's main "harassers," and Plaintiff testified about incidents with Ms. Johnson when they worked together in the 1980s, said "it never got better," and was "constant" when dealing with Ms. Johnson through her retirement in 2007.  Apparently, Ms. Johnson was the target of some of Plaintiff's early complaints of discrimination and a hostile work environment.  As the HR manager from 2000 to 2007, she would have been aware of all of Plaintiff's prior EEO activity.  However, the evidence does not show it to be more likely than not that Ms. Johnson influenced the panel's decision.  Ms. Johnson was the facilitator, and her role was to explain the procedure and guidelines, and to tally the scores.  She testified that she had no involvement in the evaluations or ratings, and there was no evidence refuting this contention. The panel members testified that no one attempted to influence them.  The evidence did not establish that the procedures explained by Ms. Johnson, or the materials she provided for the evaluations, were contrary to established merit promotion policy. Before submitting her application, Plaintiff sent an e-mail to Ms. Johnson seeking clarification as to the expectations for the position, and Ms. Johnson promptly responded, answering Plaintiff's questions.  In short, the evidence presented did not demonstrate that Ms. Johnson influenced or attempted to influence the panel members, or that she manipulated the application or evaluation process so as to adversely affect Plaintiff for discriminatory or retaliatory reasons.

As to Ms. Ivy, the theory apparently is that she was influenced by Cherry Smith (who arguably had discriminatory or retaliatory motives) and that Ms. Ivy, in turn, influenced the

panel to reject Plaintiff.  Ms. Smith was Plaintiff's supervisor from June 1997 to April 2000, was described by Plaintiff's counsel as her "longtime harasser," and was the subject of some of Plaintiff's previous discrimination complaints.[12]  The testimony was clear that Ms. Smith and Ms. Ivy had known each other since the 1980s, and Ms. Smith testified that she and Ms. Ivy were "friends," in addition to their working relationship.  While Ms. Smith was RD's Acting State Director for eight months in 2009, she was the selecting official who promoted Ms. Ivy to SFH Program Director.  (This was, however, pursuant to a merit promotion panel process.)  There was no other evidence of the extent of their relationship that would justify imputing any retaliatory or discriminatory intent from Ms. Smith to Ms. Ivy, who then in turn influenced the other panel members.  The panel members were chosen by the State Director, Mr. Allen, and there is no allegation or evidence of discriminatory or retaliatory conduct on his part.  Ms. Ivy did not volunteer to be on the panel.  At the time the panel met in 2004, Ms. Ivy was working in Forrest City and had never worked with Plaintiff.  The testimony of the other two panel members, Mr. Virden and Ms. Tucker, was convincing that they independently arrived at their scores and fairly evaluated Plaintiff as an applicant.  All three panel members gave logical explanations for why the supervisor's form did not carry the day, and they also gave credible explanations for why they gave zeros on KSA A and KSA D.  Nothing in the evidence suggested that Mr. Virden or Ms. Tucker would have any reason to be biased against Plaintiff or would have a motive to retaliate.  Although Plaintiff's counsel aggressively attacked Ms. Ivy's credibility, any

---

[12]Ms. Smith is currently Assistant to the State Director, as well as the State Civil Rights Coordinator.

weaknesses in her testimony were outweighed by other evidence in the record, particularly the testimony of Mr. Virden and Ms. Tucker.

Finally, and importantly, a further reason that Plaintiff's claim of pretext falters is that she has failed to show that the person chosen for the position, Ms. Sharp, was less qualified than Plaintiff.  In fact, the evidence shows that Ms. Sharp's specialized experience and qualifications were far superior to Plaintiff's.  Ms. Sharp was working as a procurement technician in the same division where the vacancy occurred, and had worked there for more than eleven years.  (Def.'s Ex. 12.)   Her immediate supervisor was Sharon Shireman, the person who would supervise the person who filled the open position. Plaintiff testified, "[Melinda Sharp] was already doing that job, and she was the next person in line in that office to get the promotion.  And everyone knew that that job was for her ... because she was already working in that division.  She was already there.  She was already doing that contracting."  When asked if Plaintiff contended she was better qualified than Ms. Sharp, she said, "No, she was doing that job. ... She probably had more experience, but I should have been on the best qualified list."  When asked if she was better qualified than the others who made the best-qualified list (Horton, Holloway and Mullinax), Plaintiff said she did not know because she was not on the panel and did not read their applications.  As stated, the panel gave Ms. Sharp a total score of 33, as compared to Plaintiff's score of 21.  The scores for the others on the best-qualified list were 36, 30 and 30, all significantly higher than Plaintiff's.

Evidence that the selected candidate had more relevant experience than the plaintiff and scored considerably higher on the employer's evaluation scale demonstrates "adequate and in fact, quite understandable, nondiscriminatory reasons" for a promotion

decision. *Ross*, 293 F.3d at 1047. Evidence of merely comparable qualifications between a plaintiff and the selected candidate is insufficient to raise an inference of discrimination; instead, the plaintiff must show that the selectee was *less* qualified. *Gilbert v. Des Moines Area Community College*, 495 F.3d 906, 916-17 (8th Cir. 2007); *Kincaid v. City of Omaha*, 378 F.3d 799, 805-06 (8th Cir. 2004) (to support a finding of pretext on disability discrimination claim, plaintiff must show that the employer hired a less qualified applicant rather than promoting her).

In *Gilbert*, the plaintiff did not make the group of finalists for the position at issue. In support of his argument that the employer's proffered reasons for its decision were mere pretexts for intentional discrimination, the plaintiff asserted that all the finalists were less qualified. The Eighth Circuit rejected that argument, noting that the evidence showed nothing more than comparable qualifications, which was insufficient to rebut the employer's legitimate reason for not selecting the plaintiff as part of the group of finalists. *Gilbert*, 495 F.3d at 915-17. The Court stated:

> Although an employer's selection of a less qualified candidate can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual, it is the employer's role to identify those strengths that constitute the best qualified applicant. However, we repeatedly have noted the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.

*Id.* at 916 (internal quotation marks and citations omitted); *accord Kincaid*, 378 F.3d at 805; *Ross*, 293 F.3d at 1047 ("In the usual course of events, an employer will hire the most qualified candidate, and an employer, not a federal court, is in the best position to identify

those strengths that constitute the best qualified applicant.") (internal quotation marks and alterations omitted).

Here, the person selected for the position, Ms. Sharp, had more relevant experience, already was doing some of the duties involved in the position, and scored significantly higher than Plaintiff on the merit promotion panel's evaluation scale.  Plaintiff did not claim to be better qualified than Ms. Sharp, or even better qualified than the others who made the best-qualified list.  The evidence showed, at most, that Plaintiff's qualifications were comparable to some of those on the best-qualified list.  Under *Gilbert*, this is insufficient to refute Defendant's legitimate reasons for not selecting Plaintiff.

In sum, Plaintiff has failed to carry her burden of showing by a preponderance of the evidence that the reasons advanced for her non-selection for the November 2004 purchasing agent position, or her failure to make the best-qualified list, were pretextual and that the merit promotion panel's decision was based on discrimination or retaliation. Further, she has failed to establish  the causation element of her retaliation claim, that is, that retaliation was a determining factor in the merit promotion panel's decision.

## VI.
## Allegedly Restrictive Merit Promotion Vacancy Announcements

Plaintiff claims she was the subject of discrimination and retaliation in connection with language in job announcements that she contends excluded her from consideration for merit promotion.  She contends that language requiring "listening" experience and ability was put in a vacancy announcement for a Single Family Housing Loan Specialist position in April 2006, and that this language appeared in other announcements.  Plaintiff

further contends that once the agency removed the "listening" language, officials announced jobs at improperly high GS levels, making her ineligible to apply, again with the intent to discriminate or retaliate against her.

A.    Listening Restrictions.

The particular vacancy announcement at issue is the April 2006 announcement for a State Office SFH Loan Specialist GS-1165-7/9 position.[13]   The language in question is found in the section entitled "Evaluation Criteria," which lists specific knowledge, skills and abilities (referred to as KSAs) considered to be necessary for promotion to the position in question.  KSAs 4 and 5, state:

> 4.  **Ability to convey ideas and findings in a clear, concise, and logical manner orally with groups and individuals with different socio-economic backgrounds**.
> *(Give examples showing your ability to communicate with individuals and groups. This would include successful activity/experience in listening; resolving conflict; working as a member of a team; expressing ideas and views that others understand and that influence (or persuade) them to act.)*
>
> 5.  **Ability to convey ideas and findings in a clear, concise, and logical manner.   In writing with groups and individuals with different socio-economic backgrounds**.
> *Give examples showing your ability to communicate with individuals and groups. This would include successful activity/experience in listening; resolving conflict; working as a member of a team; expressing ideas and views that others understand and that influence (or persuade) them to act.)*

Plaintiff did not apply for this position or for any of the other positions announced with the "listening" language.  Nor did she ask any official within the Arkansas office for clarification or for an accommodation.  She did mail a letter of complaint to the OCR

---

[13]The announcement is Merit Promotion Vacancy Announcement AR-06-09. (Pl.'s Ex. 33D & 56; Def's Ex. 21.)  The AR-06-09 position was to be located in the State Office and was in the section where Plaintiff works. Plaintiff also introduced other examples of announcements containing the complained-of language.  (Pl.'s Ex. 33J, 36-38.)

Director on May 22, 2006, as directed in the announcement, in which she alleged the language to be unlawfully restrictive as excluding hearing-impaired employees. The letter was sent well after the closing date for applications, but within the forty-five-day period for administrative exhaustion. I find that this claim has been administratively preserved and is properly before the Court.

However, there are several reasons why Plaintiff cannot prevail on this claim. First, her failure to apply cannot be excused on the grounds of futility. Second, the language in the KSAs cannot reasonably be interpreted to exclude a hearing-impaired person from applying or obtaining the position, and Plaintiff's reason for not applying was for personal reasons rather than because of the language. Third, Plaintiff has failed to carry her burden of showing that Defendant's intent in using the language was discriminatory or retaliatory.

1.    Failure to Apply.

To establish a claim of discrimination or retaliation in a failure-to-promote case, a plaintiff must show that she applied for an available position and was rejected. *Moore*, 524 F.3d at 885 (retaliation); *McClure v. Career Systems Development Corp.*, 447 F.3d 1133, 1135 (8th Cir. 2006) (discrimination); *Lockridge v. Board of Trustees of the University of Arkansas*, 315 F.3d 1005, 1010-11 (8th Cir. 2003) (discrimination). Failure to apply for a position may be excused if the plaintiff can show that "gross and pervasive discrimination" made it futile to apply for the position in question. *Lockridge*, 315 F.3d at 1011. "True, a plaintiff who does not apply may establish a prima facie case if the employer's discriminatory practices make application futile." *McClure*, 447 F. 3d at 1136.

Plaintiff introduced evidence that she has lagged behind others in advancement and argues that her only promotions have been the result of EEO complaints and prior

litigation.  There is also evidence that Cherry Smith has motive to discriminate or retaliate.  However, there has been no showing that those who have advanced ahead of Plaintiff are truly similarly situated[14] and the strict standard of showing futility has not been met.  She has not met the rigorous standard set forth in *McClure* and *Lockridge* for showing gross and persuasive discrimination.   In fact, she does not appear to rely on general futility; instead, she bases her argument of futility on her interpretation of the language in the announcements, saying simply that as a hearing-impaired person, she cannot "listen."  Further, as discussed below, her reason for not applying was personal, not because she believed she had no chance of obtaining the promotion because of "gross and pervasive discrimination."   In failing to apply, she has failed to establish an essential prerequisite to recovery.

    2.    Reasonable Interpretation.

    Defendant's witnesses Sherry Boerner Johnson and Sandra O'Brien, who both served as HR managers, and current State Director Lawrence McCullough testified that the language in question is contained in what they referred to as "parentheticals." They contended such material is explanatory only and not a job requirement.  However, I agree with Plaintiff that location of the language, or whether the language constitutes a requirement, is not the issue.  The real issue is whether the language in question would reasonably prevent or dissuade a deaf employee from applying for and obtaining the

---

[14]For example, Plaintiff says she helped train Ms. Ivy, who has now advanced beyond her. Ms. Ivy has a college degree and a master's degree in agricultural economics.  Plaintiff does not have the degrees, having gone to work directly from her graduation from the Arkansas School for the Deaf.  This is mentioned just to underscore the lack of proof as to whether those who have advanced beyond Plaintiff are similarly situated.

position. I find that it would not. At trial, Plaintiff's counsel equated the term "listening" with the physical ability to hear. Counsel drew the analogy of a job announcement that required an ability to lift 200 pounds overhead, having the witnesses agree that they would not bother to apply. The analogy is not apt. A purely physical requirement such as the ability to lift a particular weight would be clear-cut. The problem with Plaintiff's analogy is that listening and the physical ability to hear are distinct concepts. Actually, the thrust of the "parenthetical" language was that the successful applicant should have the ability to communicate with individuals and groups. It is clear from the overall evidence in this case that hearing impaired persons have the ability to communicate not only in writing, but also orally, through lip reading, sign language, interpreters and telephone devices for the deaf. It is also uncontroverted that Plaintiff is able to speak. The parentheticals also mentioned conflict resolution, working as a team, and expressing ideas and views that others understand and that would influence them. It is thus clear, looking at the overall context of the language in question, that listening is used in the broad sense of being able to take in information and give it thoughtful consideration. It would not reasonably preclude a hearing-impaired person from consideration or reasonably dissuade such a person from applying, especially since effective accommodations exist.

In further support of the conclusion that the language was neither exclusive nor actually interpreted by Plaintiff to exclude her, there is convincing evidence that her reasons for not applying were not based on a belief that she was ineligible for the position. First, she made no effort to inquire about the language during the open period, even though she had carefully done so in connection with the 2004 announcement for purchasing agent, where she did apply. Second, there is evidence that she failed to apply

because of personal family reasons, not because of the "restrictive" language in the announcement.

In the 2004 vacancy announcement for the purchasing agent position, as discussed above, there was a KSA which required the "ability to communicate orally." (Def.'s Ex. 3, at 2.)  It can be argued that this requirement, even more clearly than the "listening" language in the loan specialist announcement, would dissuade or disqualify a hearing-impaired person from applying.  This did not deter Plaintiff.  She contacted Ms. Johnson, saying that she was considering applying and asking specific questions about oral communication, including whether a TDD and/or interpreters would be acceptable alternatives.  She mentioned that a reasonable accommodation was required and that her e-mail should serve as her official request for the same.  Ms. Johnson responded in a positive, helpful way, making it clear that TDD use and interpreters would be considered acceptable. (Def.'s Ex. 5.)  Plaintiff clearly knew how and to whom she could address inquiries about concerns she had as to requirements for the loan specialist position in question.

Yet, she never asked Ms. Johnson[15] about the "listening" language; never asked for any accommodation, even though she had received a positive response from Ms. Johnson in connection with the earlier application; and never applied for the job.  Nor did she discuss any concerns with Mr. McCullough, who was her supervisor at the time and would have been the supervisor for the open position, and with whom she had a good

---

[15]Ms. Johnson remained as HR manager at the time the loan specialist position was announced in 2006.  Although Plaintiff complained that Ms. Johnson was one of her "harassers," the fact remains that Ms. Johnson responded positively when asked about accommodations in connection with the November 2004 purchasing agent position.

relationship.  The failure to do so, coupled with the testimony of Alta Mullinax, leads to the conclusion that her failure to apply was not the result of the language in the parentheticals. Ms. Mullinax testified that she was Plaintiff's co-worker and that they had discussed the loan specialist opening in April 2006.   Ms. Mullinax said they were discussing the application.  Plaintiff's father had just passed away.  Plaintiff said she had not gotten her application in, that she just had so much going on with her dad and her mother, who was not in good health, that she did not have a chance to get it done.  Although Plaintiff denies saying this, I find Ms. Mullinax to be the more credible witness on the point.  She said she was on cordial terms with Plaintiff.  She had no reason to be biased and was otherwise quite credible.  On cross examination, she agreed this was in a face-to-face conversation and that Plaintiff was hearing impaired, but clearly held to the position that Plaintiff knew everything she was saying.

      3.    <u>Discriminatory or Retaliatory Intent</u>.

Nor do I find that the listening language was included in the vacancy announcements to discriminate or in retaliation against Plaintiff for her earlier protected activity.  There is no direct evidence that the persons involved in adding the language did so with the intent of discriminating or retaliating against Plaintiff.  The HR manager during the period when the listening language was used was Ms. Johnson.  I would agree that her testimony, as well as that of other officials, as to the origin of the language in question was somewhat murky.  Ms. Johnson at various times said that it was done by a panel, or that it must have been developed during conferences attended by HR managers from other states.   Although she denied being the source of the listening language, she did acknowledge that she was responsible for approving it.  It appears that the language had

27

been in use at least from 2000, and was used in a number of announcements. It was not included in the 2004 announcement for the purchasing agent's position, for which Plaintiff applied. Ms. Johnson had no explanation as to why it was not. An investigation of some surrounding states showed that it was not being used in those states, but this investigation was not comprehensive for the country.

While the evidence does raise some questions as to the reasons for including the language, Defendant has raised a legitimate, nondiscriminatory, non-retaliatory reason for including it, which Plaintiff has not successfully rebutted. Looking at the testimony of all of Defendant's involved personnel, the proffered nondiscriminatory basis for using the language was that good communication is important to all positions so advertised. This appears to be a legitimate, nondiscriminatory basis, given the established fact that the hearing impaired, with available accommodations, can communicate just as effectively as hearing individuals. Although the listening language was not used in the 2004 announcement for the purchasing agent position, that announcement did contain a KSA requiring the ability "to communicate orally," which logically includes listening. Therefore, that announcement is consistent with the desire to find an applicant with communication skills. Requiring communications skills is not an invalid requirement. As stated, a hearing-impaired individual can certainly, with reasonable accommodations, possess good communications skills.

Plaintiff apparently would argue that Ms. Johnson's involvement, the confusion over the origin of the language in question, the fact that its use has been discontinued, and the history of alleged discrimination on the part of Ms. Smith and others, leads to the conclusion that the listening language must have been used with discriminatory or

28

retaliatory intent.  While these are factors I have considered carefully, I do not think she has met the burden of showing that the proffered reason for its use is a pretext.  It is just as likely that the language was used in an attempt to explain how an applicant could show communication skills, including the ability to give careful consideration to ideas expressed by others, i.e., to "listen."  Perhaps the concept could have been more carefully expressed to explicitly say that "listening" was used in the broad sense, but this does not establish discriminatory intent.

Further, the evidence shows that the language was used in announcements for several positions for which Plaintiff would not have been eligible to apply.  Defendant's Exhibit 24 is a list of announcements that included the "listening" parenthetical.  Several of those positions were restricted to a GS level that would make Plaintiff ineligible.  There would be no reason to include the parenthetical in jobs Plaintiff could not apply for in any event if the motive were to exclude her from consideration.

B.   GS Grade Restrictions.

Plaintiff contends that when the listening parenthetical was removed, Defendant's officials began announcing jobs at inflated GS levels to preclude her from advancement, again, with discriminatory or retaliatory intent.   On October 28, 2009, Plaintiff inquired as to why a loan specialist position was announced at grade GS-1165-11/12.  Ms. O'Brien responded that it was necessary to hire at a working level that would provide the immediate ability to produce work, and that filling the position with a lower GS level employee would necessitate training, frustrating that need.  Ms. O'Brien went on to say that she was getting ready to announce another specialist position (in a different section) at the same level because of the necessity of an immediate ability to produce work.  (Pl.'s Ex. 29.)  This

basis for announcing at higher GS levels was confirmed by current State Director Lawrence McCullough.  He had supervised Plaintiff for an extended period.  Plaintiff has never accused him of being discriminatory against her.  In fact, she has described him as the best boss she has had. Mr. McCullough took full responsibility for the GS level for the loan specialist position referenced in the exchange between Plaintiff and Ms. O'Brien, explaining that the position had been unfilled and that he felt pressure to be able to fully utilize approved funds for housing for the state.  For that reason, he needed a very experienced person to fill the specialist position.  He took full responsibility for requiring the higher GS levels for applicants, adding that Plaintiff had never come to him to express any interest in the position, or to ask for help or accommodation in connection with it.

Other than her general evidence that she has been discriminated against over the years and her lack of advancement, Plaintiff offered no evidence whatever that the GS level in any of the announcements was inappropriate under the circumstances.  She has failed to carry her burden of showing that the proffered nondiscriminatory reason advanced by Defendant was a pretext.

## VII.
## Accretion of Duties

The rate of pay for government employees is determined by the GS (General Schedule) rating of the position they hold.  The Classification Act, 5 U.S.C. §§ 5101-5115, applies to the classification of positions on the General Schedule.  The GS is a statutory pay schedule. 5 U.S.C. § 5332.  It covers most federal civil service positions. The GS level is determined for various positions by an analysis of the education, experience and skills

demanded by the various positions.  An employee can be promoted by the competitive merit promotion process or by what is called accretion of duties.

Reclassification of a position at a higher grade (upgrade) because of additional duties and responsibilities (accretion of duties) is a permissible, noncompetitive promotion to a higher grade and does not require competitive merit promotion procedures.  5 C.F.R. § 335.103(c)(3)(ii); *Betz v. Chertoff*, 578 F.3d 929, 932 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 1911 (2010); *Harris v. Secretary, Dept. of the Army*, 119 F.3d 1313, 1316 n.3 (8th Cir. 1997).  To establish a case of failure to receive a noncompetitive promotion due to accretion of duties in the federal employment sector, a plaintiff must demonstrate:  (1) she is a member of a protected class; (2) she applied and was generally qualified for the upgrade; (3) she did not receive the promotion; and (4) a similarly situated employee who did not have a disability received a noncompetitive promotion. *Harris*, 119 F.3d at 1320-21; *see also Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 156 (D.D.C. 2007).

A promotion through accretion of duties can occur either through a nationwide upgrade of a position or, in an individual instance, when a desk audit shows that the employee is actually performing work appropriate for a higher GS grade.  Such promotions cannot be based on seniority alone.

A nationwide accretion of duties upgrade occurs when the national office has initiated a  reevaluation of the duties of a particular position as it is being performed in the various offices throughout the country and it is determined that the position deserves a higher GS designation.  Such position reviews are done outside the state office level and are not individualized; they raise the GS grade of all persons around the country who are in the reevaluated position.  Many of the accretion promotions that have recently occurred

in Arkansas RD are the result of nationwide reevaluations.  There has been no such national reevaluation for the loan technician position which Plaintiff currently holds.

An individual employee who feels she is performing at a level above her current GS grade can request a desk audit of duties to start the process.  The employee's manager may also request the audit.  There is no guarantee that an audit will be conducted. Following the audit, the responsible officers must prepare a position evaluation report. Defendant's Exhibits 33 and 34 are examples of the process for accretion of duties promotions.  Final approval of any such promotion must come from the State Director.

Plaintiff contends that she is performing duties above her GS level and should have received promotion by accretion of duties.  Plaintiff has never requested a desk audit and stated that she never complained about being required to perform duties above her grade level.  Plaintiff testified that she has been involved with funding and financial spreadsheets, that she had been taking care of the budget and that she had been working with tracking for contracting with the county.

Cheryl Ivy testified that Plaintiff did run reports on the balance of funds in different funding accounts and that her responsibilities were involved with the program loan cost expenses where she would review the forms that came in from the field offices and other sections of the state office as well as forms generated in processing foreclosures.  She said Plaintiff would also track the funding and certify that funds were available for loan cost expenses such as title work, appraisals, etc.  However, she testified that she did not consider any of those duties to be higher than Plaintiff's current GS-7 grade level. Importantly, this view of Plaintiff's duties was confirmed by Mr. McCullough, who, as stated above, she characterizes as her best boss.  He testified that Plaintiff's duties were more

routine than complex and that he would have "considerable difficulty" justifying an increase because an accretion of duties promotion requires that the employee be performing at a level that is higher than her current position.

The USDA instruction on desk audits makes it clear that the standard for an upgrade decision is high.  It provides in relevant part:

> Positions are classified based on major regular and recurring duties.  Minor or temporary duties do not affect the positions' classification.  Additionally, volume of work is not grade controlling but rather a position management consideration.  Finally a classification determination should not address concerns regarding an individual employee's qualifications, promotion or work performance.

> . . . the new or changed duties or responsibilities must be significant, must have been performed for a minimum of nine months, and must be expected to remain as regular duties for the foreseeable future.

(Pl.'s Ex. 48).

The proof was lacking on these requirements.  In sum, looking at the evidence as a whole, I do not find that Plaintiff has carried her burden of proving that she was performing at a sufficiently high level to have been entitled to a promotion because of accretion of duties or that such a promotion was denied due to discrimination or retaliatory motives.

## VIII.
## Specific Incidents of Discrimination/Failure to Accommodate

Plaintiff points to several incidents that occurred during her employment with RD which she says are evidence of discriminatory or retaliatory intent or which demonstrate a failure to accommodate her disability.  As explained below, none of them entitles her to relief.

A.    Law.

For purposes of a disparate treatment claim, an adverse employment action is a tangible or intangible change in working conditions that produces a material employment disadvantage. *Buboltz*, 523 F.3d at 868. Nevertheless, "not everything that makes an employee unhappy is an actionable adverse action." *Id.* For example, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet this standard, but a job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient. *Id.* Minor changes in duties or working conditions, "even unpalatable or unwelcome ones," which cause no materially significant disadvantage are not actionable. *Id.*

A denial of training or a denial of sick leave, without more, is not an actionable adverse employment action. *Higgins*, 481 F.3d at 585 (denial of supervision, mentoring and training so as to be "set up for failure"); *Box v. Principi*, 442 F.3d 692, 697 (8th Cir. 2006) (denial of training and denial of annual leave); *Hardeman v. United States*, 682 F. Supp. 2d 947, 954 (E.D. Ark. 2010) (denial of sick leave, placement on a performance improvement program, and requirement of permission for overtime).

As stated earlier, the adverse action must have been taken solely because of the plaintiff's disability. *Mershon*, 442 F.3d at 1076 n.4; *Peebles*, 354 F.3d at 767 n.5.

To be "materially adverse" in the context of a retaliation claim, it is not necessary that the adverse action produce a material employment disadvantage, only that a reasonable employee in plaintiff's position might well have been "dissuaded" from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Higgins*, 481 F.3d at 589-90. This is an objective standard.

*Burlington*, 548 U.S. at 68.  A plaintiff must show that the retaliation produced some injury or harm.  *Id.* at 67.  "Petty slights [or] minor annoyances," personality conflicts and snubbing by supervisors and co-workers, are not materially adverse retaliatory actions.  *Id.* at 68; *accord Sutherland v. Missouri Department of Corrections*, 580 F.3d 748, 752 (8th Cir. 2009); *Clegg v. Arkansas Department of Corrections*, 496 F. 3d 922, 929 (8th Cir. 2007) (failure to provide training, negative reports and evaluations, and exclusion from meetings, were "at most trivial," failing to meet *Burlington*'s standard); *Higgins*, 481 F.3d at 589-90.

    B.    <u>Pleaded Incidents</u>.

    1.    <u>Use of Intercom</u>.  In her complaint, Plaintiff alleged that on February 11, 2004, RD used the intercom system to notify employees to log off their computers in order to restart the system.  At trial, there was no testimony about that specific incident,[16] but there was testimony that the intercom system was "sometimes" used for announcements and that it was not a viable way to communicate with Plaintiff.  Cherry Smith testified that if an intercom announcement was made, someone would be sent to notify Plaintiff, either her first line supervisor or someone from HR, or an e-mail would be sent.  Plaintiff testified that "sometimes" she was not notified when the intercom was used for announcements "but they're doing better."  Plaintiff said she never lost any database or experienced any trouble from a computer shutdown or restart but, if she had, "it would have been a disaster."

---

[16]The exhibits did include a February 11, 2004 e-mail from an officer in another USDA agency concerning the server restarting, and asking whether hearing impaired employees were notified by means other than the intercom.  (Pl.'s Ex. 64.)  No responsive e-mail was submitted.

This isolated incident did not amount to an adverse employment action for purposes of a disparate treatment claim, nor to a materially adverse action for purposes of her retaliation claim. She experienced no harm or disadvantage. Nor is there any evidence that using the intercom on the February 11, 2004 occasion – or any other occasion – was due to discriminatory or retaliatory intent on the part of any agency personnel. Even if it could be said to be a failure to accommodate, no harm arose from the one-time lapse.

2. <u>December 2004 IT Notification</u>. Plaintiff alleges that, on one occasion in December 2004, the IT department used e-mail and "voice com" to notify employees of computer maintenance and upgrades, but that she received only e-mail notification, even though her TDD has the capability to receive voice com messages. There was no testimony about this specific incident, but Plaintiff testified in her deposition and at trial that, on any occasion that she was not notified that the server would be shut down or not notified of a computer upgrade or maintenance, she never lost any database and never experienced any kind of trouble.

Again, this isolated incident did not amount to an adverse employment action for purposes of a disparate treatment claim, nor to a materially adverse action for purposes of her retaliation claim. She experienced no harm or disadvantage. Nor is there any evidence that sending her only one form of communication was due to discriminatory or retaliatory intent on the part of any agency personnel. Sending the message by e-mail was also a reasonable accommodation.

3. <u>Disability Awareness Month</u>. According to the testimony, Disability Awareness Month has been observed only once during Plaintiff's tenure with RD, in October 2006, even though other groups are annually recognized, such as minorities and

women.  Plaintiff testified that the observance came only after she had filed this complaint in February 2006, with the specific allegation that the special emphasis month was not being recognized.   Plaintiff contends that this reflects the agency's unwillingness to educate and inform its employees about disabilities.  Ms. Smith testified that Plaintiff never asked her about observing Disability Awareness Month, or complained that it was not being observed.  The agency's failure to regularly observe Disability Awareness Month did not amount to an adverse employment action for purposes of Plaintiff's disparate treatment claim, nor to a materially adverse action for purposes of a retaliation claim.  She has not demonstrated that the lack of observance caused her any materially significant disadvantage or harm.  It is unfortunate that agency officials chose not to make this observance except when prompted by Plaintiff's federal court complaint, but she has failed to demonstrate that the decision was due to discriminatory or retaliatory intent.

4.    Omission from Telephone Directories.  Plaintiff's name and extension were omitted from an employee telephone extension list on March 14, 2004, and from an "updated" telephone list on March 26, 2004.  (Pl.'s Ex. 60 & 61.)  Both lists were distributed by Sherry Boerner Johnson.  Plaintiff testified that the omissions made her feel "invisible" and that, after the lists were distributed, several people asked her if she was still working for the agency.

Ms. Johnson testified that Plaintiff's extension should have been on the lists, the omission was an oversight, and it was "corrected immediately."  There was other evidence that the phone lists were not the official telephone directory, were used for state office employees, and were frequently updated by the various sections to reflect personnel changes.  Plaintiff's name and TDD number have been listed in the official directory for the

state office since 1995, and for the field offices since at least March 2001.   (Pl.'s Ex. 4, ¶ 5; Def.'s Ex. 38 & 39.)

These were isolated, minor incidents that did not amount to an adverse employment action for purposes of a disparate treatment claim, nor to a materially adverse action for purposes of her retaliation claim.  Plaintiff experienced no harm or disadvantage.  Nor is there any evidence that the omissions were due to discriminatory or retaliatory intent on the part of any agency personnel.  Instead, they were merely unfortunate oversights in unofficial section telephone lists which were corrected immediately.

5.   October 2004 Resent E-mail.  Plaintiff alleges that, on October 7, 2004, she received a "resent" e-mail regarding telephone conversion, indicating that she was the only employee who did not receive the original e-mail.  There was no testimony about this incident.  This minor incident was not an adverse action in any sense, nor does it reflect any discriminatory or retaliatory intent.  Plaintiff suggests that the resending indicates she was excluded from other e-mails, but this is speculative and unwarranted by the evidence.

6.   Cumulative Conduct.  In closing arguments, Plaintiff's counsel acknowledged that the above specific incidents, standing alone, would be insufficient to sustain her case, saying she is making "a totality argument."   In determining whether any individual action was sufficiently adverse for purposes of a disparate treatment claim, the Court can consider the cumulative effect of the employer's allegedly discriminatory actions.  *Phillips v. Collings*, 256 F.3d 843, 849 (8th Cir.2001); *see also Higgins*, 481 F.3d at  587-88. Additionally, in evaluating a retaliation claim, an employer's actions may be considered cumulatively -- "extreme, systemic retaliatory conduct resulting in serious employment consequences" may be considered materially adverse.  *Devin v. Schwan's Home Service,*

38

*Inc.*, 491 F.3d 778, 787-88 (8th Cir. 2007).   Even considering the properly pleaded incidents cumulatively, I still conclude that Plaintiff has failed to establish that she suffered adverse action capable of supporting her claims for discrimination or retaliation.

    C.    <u>2009 Incidents</u>.

    1.    <u>Failure to Plead</u>.   Plaintiff offered extensive testimony and exhibits regarding four incidents that occurred in 2009: (1) the failure to provide an interpreter for her at a July 7, 2009, meeting about the denial of advanced sick leave; (2) a demand for her to take notes at a different meeting on July 7, 2009; (3) the failure to provide closed captioning for training "webinars" in March 2009; and (4) a delay in issuance of her performance plan, due in October 2009.   Regardless of whether Plaintiff's failure to administratively exhaust these claims with USDA is excused by futility or the "like or reasonably related" exception, the record is clear that these claims were never pleaded and thus are not properly before the Court as a basis for relief.   Plaintiff did not raise the arguments in her complaint or her amended complaint, nor has she ever sought leave to further amend her complaint to include them.   In its trial brief and at trial, Defendant asserted that these arguments should not be considered as substantive claims because they were not included in her complaint or amended complaint.

    Plaintiff's allegations regarding these incidents were not sufficiently pleaded, were not tried by consent, and cannot provide a basis for relief.   *See Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 827 (8th Cir. 2009) (district court properly dismissed claims regarding denial of advance notice and severance pay where allegations did not appear in complaint); Fed. R. Civ. P. 15(b)(2). They must be dismissed on this basis.

Alternatively, the evidence at trial failed to establish that any of the claims are meritorious.

2.      <u>Failure to Provide Interpreter at Meeting</u>.  On the afternoon of July 7, 2009, Plaintiff was called to the office of Ms. Ivy, her immediate supervisor, to discuss Plaintiff's request for eight hours of advance sick leave for her absence on July 6.  Ms. Smith (at that time Acting State Director) and Ms. O'Brien (HR manager) also attended the meeting.  Ms. Smith began to go over the procedural requirements for obtaining advance sick leave, and Plaintiff immediately became upset and left the room.  After about fifteen minutes, Plaintiff returned but could not continue the conference.  Ms. Smith delivered a written memo to her.  (Def.'s Ex. 41.)  The letter explained that advance sick leave was appropriate only when an employee has a serious ailment lasting more than three days and when the request is accompanied by a supporting medical statement.  The letter further explained that Plaintiff had exhausted all her earned sick leave and had already been advanced forty hours.  An immediate supervisor is not authorized to advance more than forty hours, necessitating the involvement of Ms. Smith.  The letter stated that because Plaintiff had a negative sick leave balance and did not have a serious illness of more than three days and a medical certificate, her request was denied.  Plaintiff ended up taking annual leave for her absence.

There was no direct testimony from Plaintiff that she requested an interpreter for this meeting, and I find that she did not.  None of the other participants in the meeting testified that she requested an interpreter.  Plaintiff's testimony was that, before the meeting began, she told Ms. Ivy it "would be hard for [her] to hear because there would be too many people" and that Ms. Ivy replied, "You can hear."  In follow-up letters dated July 28 and

September 4, Plaintiff never stated that she requested an interpreter and that one was denied.  (Pl.'s Ex. 12 & 14.)  Plaintiff's apparent argument is that she did not have time to request an interpreter because she did not know about the meeting ahead of time, and that the other participants should have known that she would need an interpreter for a meeting of this type.

Under the terms of the April 2004 settlement agreement, Plaintiff agreed "to henceforth identify any need for accommodation of her hearing impairment, to include interpreters, training, and equipment," and the agency agreed "to provide reasonable accommodations identified by plaintiff as appropriate."  (Pl.'s Ex. 11 ¶ 8; Def.'s Ex. 1 ¶ 8.)  Mr. McCullough testified that, during the many years he worked with Plaintiff, he relied on her to alert him when there was a need for an interpreter and that she did not request interpreters for interoffice staff meetings.  Ms. Smith testified that it was her understanding that Plaintiff was capable of understanding in a small setting, with the speakers in close proximity, and that she had participated in conversations in the office.  Ms. O'Brien testified that, in her experience, Plaintiff could "communicate across the desk" on a day-to-day basis.  Ms. Smith testified that it was Plaintiff's responsibility to request an interpreter when needed and that, if one had been requested, it would have been made available.  Ms. O'Brien testified that Plaintiff had the "clearly defined" responsibility to ask for an interpreter if needed and that she could have asked for the meeting to be stopped because she wanted one.  The record contains documentation showing that Plaintiff requested an

interpreter on many occasions for meetings, training, conferences, etc., and that one was consistently provided.[17]

"If an employee fails to make a request for accommodation, then his employer has no duty to accommodate." *Buboltz*, 523 F.3d at 870.  Here, Plaintiff did not request an interpreter, she had at least two opportunities to do so, the other participants reasonably believed that she would be able to communicate in a small interoffice setting, and she was provided a written memo setting forth the reasons for the denial of her request for advanced sick leave.  There is no evidence that she requested a follow-up meeting with an interpreter.  She does not question the correctness of the decision to deny the advanced sick leave request, nor does she allege that the denial itself was made due to discrimination or retaliation.  She acknowledged that she did not have a doctor's statement and that her illness (a virus) was not of at least three days' duration.

Under these circumstances, Plaintiff has failed to demonstrate that Defendant failed to accommodate her disability under the Rehabilitation Act.  Furthermore, this incident did not amount to an adverse employment action for purposes of a disparate treatment claim, nor to a materially adverse action for purposes of her retaliation claim.  Further, the evidence does not establish discriminatory or retaliatory intent on the part of any agency personnel.

3.    Demand to Take Notes at Meeting.  Plaintiff alleges that her supervisor, Ms. Ivy, directed her to take notes during a meeting on the morning of July 7, 2009, ignoring the fact that she could not take notes with her eyes on her writing and simultaneously

---

[17] *See, e.g.*, Pl.'s Ex. 67, pp. 286-306.

understand the substance of the information being orally communicated.  She testified that, when she said, "That's not possible," another co-worker volunteered.  Plaintiff said she "felt belittled in front of [her] other co-workers."  Ms. Ivy acknowledged that she asked Plaintiff to take notes at the meeting, but said she was sorry about it and that she had never asked her before and never asked her again. She said Plaintiff did not appear visibly upset and that another employee offered to take the notes.  There was no evidence that Plaintiff was reprimanded for declining to take the notes, or that any negative connotation was drawn from it related to her job performance.  This incident does not amount to an adverse employment action to support a disparate treatment claim, or a materially adverse action for purposes of her retaliation claim.  Furthermore, the evidence does not demonstrate discriminatory or retaliatory intent.

4.    <u>Failure to Accommodate in Webinar</u>.  Plaintiff alleges that RD failed to provide reasonable accommodation for her hearing impairment with respect to informational and training seminars offered to employees in March 2009.  According to the testimony and exhibits, Ms. Ivy sent an e-mail to Plaintiff on March 4, 2009, inviting her to attend a non-mandatory training "webinar" on guaranteed loans and asking if she would need "an interpreter or other assistance to participate."  Plaintiff replied that an interpreter would be of little assistance for audio-visual training but asked if the training sessions would have open or closed captioning.  She referred Ms. Ivy to 36 C.F.R. § 1194.24(c), which mandates open or closed captioning for all agency training.[18]  Ms. Ivy contacted

_____

[18]Section 1194.24(c) provides: "All training and informational video and multimedia productions which support the agency's mission, regardless of format, that contain speech or other audio information necessary for the comprehension of the content, shall be open or closed captioned."  It is part of the Electronic and Information Technology Accessibility Standards

Kristina Zehr, the webinar developer in the USDA national office.  Ms. Zehr advised by e-mail that closed captioning was not available but that, according to the division's contact for compliance with the applicable regulations, "speaking notes accompanying the power point slides is a reasonable accommodation."  Ms. Zehr advised that the speaker's notes would be available soon through a website link.  Ms. Ivy relayed this information to Plaintiff.  (Pl.'s Ex. 16, 65; Def.'s Ex. 40.)

Ms. Ivy testified that she had clicked on the link to view the Power Point presentation and speaker notes.  She said she was not sure if the notes were a verbatim transcript of what the speaker was saying, and she did not know how a hearing-impaired person would be able to participate in the question-and-answer session following the presentation.  There was no refuting evidence on this issue, nor was there any evidence as whether the lack of closed captioning was an agency choice or a technological impossibility.  Plaintiff said she never accessed the link for the training presentation.

To prove that the employer impeded or failed to participate in an interactive process regarding a reasonable accommodation, a plaintiff must show: (1) that her employer knew she was disabled; (2) that she requested accommodations; (3) that her employer did not make a good faith effort to assist her in making accommodations; and (4) that the employer could have reasonably accommodated her disability, but for its lack of good faith.  *Buboltz*, 523 F.3d at 870; *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005).  As

---

implementing Section 508 of the Rehabilitation Act (29 U.S.C. § 794d).  Section 508 requires federal agencies to provide federal employees with access to and use of information and data that is comparable to that provided for non-disabled federal employees. 29 U.S.C. § 794d(a)(1)(A); 36 C.F.R. § 1194.1.

stated, the employer need not provide the exact accommodation requested. *Buboltz*, 523 F.3d at 870.

While I am troubled by the agency's apparent noncompliance with a mandatory regulation, Plaintiff has failed to carry her burden of demonstrating that the speaker's notes were not a reasonable accommodation for her disability.  Here, Ms. Ivy initiated the discussion about whether Plaintiff would need any assistance in participating in the training, Ms. Ivy asked the training developer about closed captioning at Plaintiff's request, the training developer sought information from the regulatory compliance contact, the compliance contact advised that closed captioning was not available but that speaker's notes would be a reasonable accommodation, and that information was relayed to Plaintiff. This demonstrates a good faith effort on the part of agency officials to assist her in obtaining accommodations.  While not the exact accommodation she requested, Plaintiff has failed to prove that the accommodation offered by the national office was not reasonable.

Furthermore, failure to provide closed captioning for this training did not amount to an actionable adverse action under the above-cited authorities.   Plaintiff has not demonstrated that she was harmed or disadvantaged by the lack of training, and she made no attempt to avail herself of the offered accommodation for accessing the training sessions.  Nor is there any evidence that the failure to provide closed captioning was due to discriminatory or retaliatory intent.  As stated, the decision came from individuals in the national office, which are not alleged to have any reason to discriminate or retaliate against her.

5.    Delayed Performance Plan.  Plaintiff alleges that issuance of her most recent

annual performance plan (due in October 2009) was delayed until April.  The testimony

from Ms. Ivy, was that the plans for all employees under her supervision were delayed until

April, not just Plaintiff, due to some "system issues."  This incident was not sufficiently

adverse for purposes of Plaintiff's discrimination or retaliation claims.  Additionally, as it

affected all employees, it cannot demonstrate discriminatory or retaliatory intent.


**IX.**
**Cherry Smith's "Drop File"**

Plaintiff's  Exhibit  67  deserves  comment.   It  is  a  collection  of  313  pages  of

documents involving Plaintiff, which has been kept by Cherry Smith.  These documents are

dated from 1998 through 2005.  Defendant produced this collection late in discovery and

Plaintiff's counsel characterizes it as an illegal "drop" file.[19]  It was offered to show bias and

retaliatory intent on the part of Ms. Smith, who was Plaintiff's supervisor for a time and

Acting State Director for a time.   As stated, she is currently the Assistant to the State

Director.

I have reviewed the entire exhibit.  It consists of various types of papers, such as

notes regarding meetings, documents relating to obtaining interpreters on many occasions,

complaint letters by Plaintiff, responses by Ms. Smith, witness statements, pleadings, etc.

I do not give significant weight from the mere fact it was kept.  There is other proof that Ms.

Smith would at least have a motive to discriminate or retaliate, arising out of Plaintiff's prior

---

[19]The term "drop file" was never really defined.  Apparently, Plaintiff would argue that it is
a violation of privacy laws for a non-supervisor to maintain a file on other employees.  The legality
of keeping the materials is not before the Court.

complaints against her.  The fact that these materials were collected does not add much, if anything, to the picture.  The materials in the "file" are innocuous in and of themselves. In fact, they show, at least to some extent, that the complaints and feelings of discrimination went both ways.  For example, Ms. Smith in 1999 expressed the feeling that Plaintiff was retaliating against her.  (Pl.'s Ex. 67, p.55.)  The materials also show that Plaintiff arguably was overreacting to Ms. Smith's supervisory method.  For example, she complained that she was yelled at and she alluded to workplace violence.  There is no record of violence.  The yelling accusation arose out of a June 17, 1999,  incident where Ms. Smith confronted Plaintiff about her failure to come to Ms. Smith's office as directed. Two witnesses said that while Ms. Smith spoke louder than she would to others, it was apparent she was not disrespectful, not yelling and was merely trying to make sure Plaintiff understood what she was being told.  (*Id.* at pp. 154-55.) It is true that Ms. Smith confronted Plaintiff in front of other workers, but there was no proof that Plaintiff was singled out for such treatment.

Counsel would argue that keeping the file both showed bias and that it was kept for the purpose of retaliating.  It is just as likely that the materials were kept as a defensive measure.  Ms. Smith had been the subject of prior complaints of discrimination and retaliation by Plaintiff.  It is not unreasonable that a person in that situation would want to maintain records relating to actual events in their interaction.

More importantly, perhaps, is the fact that Ms. Smith has not been implicated directly in the main claims in this action: *i.e.*, the failure to select Plaintiff for promotion to purchasing agent; the use of "listening" language or wrongful inflation of GS levels in subsequent vacancy announcements; and the failure to promote by accretion of duties.

Any discriminatory or retaliatory intent on her part did not lead to those actions, and Plaintiff has failed to show by a preponderance of the evidence that Ms. Smith indirectly influenced the outcome in those instances.

In addition, regardless of Ms. Smith's intent, Plaintiff has failed to establish that she was, in any way, adversely affected by Ms. Smith's keeping of this file.  Therefore, it does not constitute an adverse action that can support Plaintiff's claims of discrimination or retaliation.  *See Higgins*, 481 F.3d at 586 (supervisor's "shadow file" did not constitute adverse employment action).

## X.
### Conclusion

For the reasons set forth above, Plaintiff has failed to demonstrate that she is entitled to relief on any of her claims for disability discrimination, retaliation or failure to accommodate.  Judgment for Defendant will be entered separately.

IT IS SO ORDERED this 7th day of July, 2010.


_____
UNITED STATES MAGISTRATE JUDGE